

# JONATHAN SUSSMAN, ESQ.

**3**91 E. 149th Street, Suite 205A, Bronx, NY 10455

**M**obile: 215-913-9894 **O**ffice: 347-218-9289

**F**ax: 718-744-2977 Sussmanlawpc.com

**E**-Mail: lawyerjonathansussman@gmail.com

March 10, 2021

<u>Via ECF and by email</u>

Honorable Ronnie Abrams
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re:         **<u>United States v. Ariel Burgos</u>**
               **18 Cr. 570 (RA)**

Dear Honorable Judge Abrams:

      Pursuant to a retainer, I am the attorney retained to represent defendant Ariel Burgos in the above-captioned matter.  Mr. Burgos has been released with a condition of home confinement since his arrest on July 17, 2018.  The next current scheduled activity on his case is April 5, 2021 for his self-surrender.  I write to request that the Court grant Ariel Burgos compassionate release, pursuant to 18 U.S.C. §3582(c), and modify his term of imprisonment by reducing it to time served.  On February 21, 2020, the Court sentenced Mr. Burgos to a term of imprisonment of 36 months followed by three years of supervised release.  The Court originally ordered Mr. Burgos to surrender on April 21, 2020 but on subsequent dates granted several motions to extend the surrender date to April 5, 2021, in light of the COVID-19 pandemic and the substantial risks it posed to his health.

Mr. Burgos is a 34-year-old man living with his wife, daughter, and son in Manhattan in New York City. He has asthma and other respiratory issues as reflected by his medical records. His son, Messiah Knezevic, and wife, Samantha Torres, have significant medical issues as well. We enclosed his young son's special needs assessment and visit history. <u>See</u> <u>Exhibit C</u>. Additionally, his wife had another very painful second trimester miscarriage after a very early premature birth and then a brutal fall in the hospital that is now the subject of a civil lawsuit against the hospital. <u>See</u> <u>Exhibit D</u>. We have included Mr. Burgos' medical documents which include his asthma and acute upper respiratory infection diagnoses. In addition, we have included his list of medications including his inhaler which we enclose with two photos of his nebulizer machine. <u>See</u> <u>Exhibit B</u>. These conditions place Mr. Burgos among those at highest risk of dying or developing severe medical complications from COVID-19. Requiring Mr. Burgos to surrender to a BOP facility will not serve any legitimate goals of sentencing but will unnecessarily expose both Mr. Burgos and the community he will return to after his sentence is complete- including his wife, daughter and son- to this disease.

Recognizing that "the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals," <u>United States v. Scparta</u>, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020), an "overwhelming" number of federal courts have answered the call from public health experts and policymakers to reduce the nation's prison population by granting compassionate release to those who are most vulnerable to COVID-19 and no longer pose a danger to society. <u>Samy v. United States</u>, No. CR 16-20610- 1, 2020 WL 1888842, at *4 (E.D. Mich. Apr. 16, 2020). This Court should do the same for Mr. Burgos and the public's general welfare.

If the Court declines Mr. Burgos' motion for compassionate release, he respectfully requests a further extension of his self-surrender date until the pandemic is under control and the danger to his health is abated.

### **The COVID-19 Pandemic**

The United States and the world are in the midst of a serious and urgent public health crisis and New York is the U.S. epicenter. On March 11, 2020, the World Health Organization officially classified COVID-19 as a global pandemic. In March of 2020, the Federal Emergency Management Agency (FEMA) declared New York "a major disaster." In New York State, as of this writing, there are 1.6 million cases of coronavirus, and 47,247 deaths[i]. The exponential rate of coronavirus infection is unprecedented during our lifetimes.

In its least aggressive form, COVID -19 can cause individuals to experience fever, cough, and shortness of breath. However, recent data from the United States suggest anywhere from 18% to 55% of cases result in a far more severe experience of the illness and require hospitalization. Common complications include bilateral interstitial pneumonia, causing partial or total collapse of the lung alveoli and making it difficult or impossible for

patients to breathe. Thousands of patients have required hospital-grade respirators because COVID- 19 can progress from a fever to life-threatening pneumonia with what are known as "ground-glass opacities," a lung abnormality that inhibits breathing. Due to the risk of contagion, people who die from COVID-19 continue to die alone, unable to breathe.

The United States is the hardest hit by the global pandemic—with over 28 million documented cases and over half a million deaths[ii]. As of March 3, 2021, over 116 million people in scores of countries have been diagnosed with COVID-19 and over 2.57 million people have died[iii]. Globally, at least 500,000 people are contracting the disease daily and close to 10,000 people are dying every day[iv]. In the United States, despite certain states' decisions to ease restrictions, the virus shows no signs of stopping. The number of cases and deaths are rising by the day and expected to continue to rise exponentially.  In recent days, Dr. Anthony Fauci reported observing a "disturbing surge" in COVID-19 infections, as restrictions across the country continue to ease, warning the daily number of cases in the U.S. might soon hit 100,000. Data compiled by Johns Hopkins University reveals a surge in the seven-day average number of COVID-19 cases during the week of March 1, 2021.  On March 1, 2021, new cases in the U.S. surged by more than 67,000 in a single day, surpassing 29 million in total cases across the country[v]. In short, the spread of the virus is an ongoing and multiplying national crisis, and it is upon this global, unfolding backdrop that Mr. Burgos requests that he be permitted to remain in the safety of his home for the duration of his sentence.

## Compassionate Release is Appropriate Due to the Pandemic

### I. Standard

The Court should grant Mr. Burgos compassionate release, pursuant to 18 U.S.C. § 3582(c) and sentence him to time served. The First Step Act amended the compassionate release statute to expand district courts' abilities to grant compassionate release. Under the relevant section of the First Step Act, a sentencing court:

"upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant . . . after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction; . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

18 U.S.C. § 3582(c)(1)(A).

The policy statement issued in exercise of the authority Congress delegated to the Sentencing Commission in 28 U.S.C. § 994(t) defines "extraordinary and compelling circumstances" to include a defendant's medical conditions, age, family circumstances, and "other reasons." See U.S.S.G. § 1B1.13, Application Note 1. Included in the aforementioned enumerated circumstances are circumstances where,:

"the defendant is ... suffering from a serious physical or medical condition, or . . . experiencing deteriorating physical . . . health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."

U.S.S.G. § 1B1.13(2) & cmt. n.1(A)(ii)(I), 1(A)(ii)(III).

The Commission also requires that the defendant not be "a danger to the safety of any other person or to the community." Id. The First Step Act sought to expand district court discretion to determine what constitutes "extraordinary and compelling" reasons for a sentence reduction under the statute, thus expanding its use.

As such, this Court is authorized to reduce a previously-imposed prison sentence pursuant to this provision of the statute if it finds "extraordinary and compelling" reasons for it after consideration of the 18 U.S.C. § 3553 factors, if that sentence reduction is "consistent with applicable policy statements issued by the Sentencing Commission," and the defendant doesn't present a danger to the community. See 18 U.S.C. § 3582(c)(1)(A); see also, e.g., United States v. Wong Chi Fai, No. 93 Cr. 1340 (RJD), 2019 WL 3428504, at *2 (E.D.N.Y. July 30, 2019).

District courts have reduced prison sentences for many reasons, including circumstances where the reduction is opposed by the Bureau of Prisons and where the underlying reasons for the reduction are not one of the Sentencing Commission's enumerated reasons. See, e.g., United States v. Young, No. 00 Cr. 02, 2020 WL 1047815, at *5-6 (M.D. Tenn. Mar. 4, 2020) (granting compassionate release and rejecting government argument that defendant's motion should be denied because he did not meet the medical criteria in U.S.S.G.§ 1B1.13, finding that "district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release"); United States v. Beck, No. 13 Cr. 186, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (finding that "[w]hile the [Sentencing Commission's] old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction" and granting release based on the BOP's mismanagement of defendants medical care. While compassionate release must be consistent with the Sentencing Commission's guidance, this Court is not limited to the

specific enumerated examples set forth by the Commission in finding "extraordinary and compelling" reasons for release.

## II. Exhaustion of Mr. Burgos' Administrative Remedies is Futile Because He is not Currently in a BOP Facility

Mr. Burgos has been sentenced but has not yet surrendered or been designated to a BOP facility to serve his sentence of thirty-six months. Were it not the case that he continues to await designation to a BOP facility at which he is to surrender on April 5, 2021, defense counsel would have surely filed a request for compassionate release on behalf of Mr. Burgos with the warden of the designated facility. However, there is no such opportunity for Mr. Burgos to exhaust his administrative remedies here, and Mr. Burgos' motion for a sentence reduction is appropriate at this time.

Prior to the expansion of the compassionate release statute by the First Step Act of 2018, sentence reductions were only permitted upon motion of the Director of the Bureau of Prisons. Pub. L. 115-391 § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). The amended statute, however, expanded courts' abilities to consider motions filed by defendants, thereby fulfilling the legislation's intent to expand access to compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i).

First, under the governing statute, Mr. Burgos need not be in the physical custody of the Bureau of Prisons to apply for a sentence reduction under § 3582(c)(1)(A). Section § 3582(c) provides for the possibility of a sentence reduction "once [the term of imprisonment] has been imposed." The statute's language does not mandate that a defendant be in physical custody in order to avail themselves of the modification provided for by the statute. United States v. Joel Austin, No. 06-cr-991 (JSR), ECF No. 72 (S.D.N.Y. June 23, 2020) ("Notably absent from this statute is an express requirement that a defendant be in the custody of the Bureau of Prisons [ ] at the time he petitions for compassionate release . . . [T]he only absolute requirement is that a defendant be subject to a federal sentence").

Second, district courts have granted a number of sentence reductions under 18 U.S.C. §3582(c)(1)(A) to defendants who had yet to begin serving their imposed terms of imprisonment in a BOP facility. For instance, in United States v. Daniel Hernandez, the district court found that the defendant had sufficiently exhausted his administrative remedies, where the defendant was being held in a private facility and in the custody of the United States Marshals, thus rendering the BOP incapable of responding to the defendant's request. No. 18-cr-834 (PAE), 2020 WL 1684062, at *2 (S.D.N.Y Apr. 2, 2020). In that case, the government's brief reflected agreement with the defendant's eligibility to bring the motion for compassionate release. *See* Government Letter dated April 1, 2020, No. 18 Cr. 834 (PAE), ECF Dkt. 448. Similarly, in United States v. Daly and United States v. Dana, the

government conceded that ordinary administrative remedies could not be exhausted because the defendants were in the custody of the United States Marshals at a private facility and had not yet been designated to the BOP facility at which they were to serve their imposed term of imprisonment. Government Letter dated April 3, 2020, United States v. Daly, No. 16-cr-281 (PGG) (S.D.N.Y.), ECF Dkt. 861; Government Letter dated March 31, 2020, United States v. Dana, 14-cr-405 (JMF) (S.D.N.Y.), ECF Dkt. 107.

The Honorable Jed S. Rakoff recently granted a sentence reduction to an individual who was out of custody and awaiting a fast-approaching surrender date, stating:

> The Court [ ] considers [the defendant] to be, de facto, in the same position as a defendant already in custody. To hold otherwise – that is, to find Austin ineligible to bring the instant motion today, but eligible next week [upon his scheduled date of surrender], though only after suffering the severe and irreversible disruption that a return to prison would cause – would be a hypertechnical and inequitable result, more akin to a seventeenth-century battle of writs than to the mandate of modern law to render substantial justice.

United States v. Joel Austin, No. 06-cr-991 (JSR), ECF No. 72 (S.D.N.Y. June 23, 2020).

District courts in other jurisdictions have also considered compassionate release motions filed by defendants outside of BOP custody, issuing consistent decisions. In United States v. Teresa Ann Gonzalez, the district court found that it would have been futile for the defendant to attempt exhausting her administrative remedies where the defendant was in the custody of a local jail and had not yet been designated to a BOP facility. No. 2:18-cr-232-TOR, Dkt. 834 (E.D. Wash. Mar, 31, 2020). In that case, a BOP employee had even suggested seeking sentencing relief from the Court in declining to process the defendant's request for a sentence reduction, and the district court ultimately found the defendant to have the satisfied the statutory exhaustion requirement. Id.

Finally, in other jurisdictions, the government has admitted to the futility of exhausting administrative remedies where the defendant is not in the custody of a BOP facility. See, e.g. United States v. Gentry, No. 2:19-cr-78, Dkt. 98 (D.N.J. Apr. 5, 2020) (consenting to the defendant's motion for compassionate release because the defendant was not in BOP custody and, therefore, the BOP did not have the ability to bring a motion on his behalf); United States v. Ghorbani, No. 1:18-cr-255, Dkt. 129 (D.D.C. Apr. 3, 2020) (recognizing that "exhaustion of administrative remedies can be waived when seeking relief will be futile," as it was where the defendant had been designated to a BOP facility but not yet transferred into BOP custody).

In short, the statutory language, as well as its application in this district and other jurisdictions, supports Mr. Burgos's eligibility to submit this motion for compassionate release.

### I. Mr. Burgos's Vulnerability to COVID-19 is an Extraordinary and Compelling Reason that Warrants a Sentence Reduction

To date, many courts have considered and granted compassionate release during the COVID-19 pandemic. See, e.g., United States v. Field, No. 18 Cr 246, ECF No. 38 (May 4, 2020) (Oetken, J.); United States v. William Knox, No. 15 Cr. 445, ECF No. 1088 (S.D.N.Y. Apr. 10, 2020) (Englemeyer, J.); United States v.Wilson Perez, No. 17 Cr. 513, ECF No. 98, (S.D.N.Y. Apr. 1, 2020) (Torres, J.); United States v. Darnell Jackson, No. 15 Cr. 135 (ENV), ECF No. 208 (E.D.N.Y. Apr. 6, 2020); United States v. Sawicz, No. 08 Cr. 287 (ARR), 2020 WL 1815851, at *2 & n.2 (E.D.N.Y. Apr. 10, 2020). Though courts are not constrained by the enumerated examples provided in the applicable policy statement, one such example finds that an extraordinary and compelling reason for the granting of a sentence reduction exists where a defendant is "suffering from a serious physical or medical condition. . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." U.S.S.G. § 1B1.13(2) & cmt. n.1(A)(ii)(I), 1(A)(ii)(III).

Judges in this District have acknowledged that a defendant's comorbidities constitute a "serious physical or medical condition" that make them particularly susceptible to the risk of grave illness or death within a correctional facility during this COVID-19 pandemic— consistent with the policy statement's enumerated examples of extraordinary and compelling reasons to reduce an imposed term of imprisonment. United States v. Melanie Williams-Bethea, No. 18-cr-78 (AJN), ECF No. 173 (S.D.N.Y. June 2, 2020) (ordering a sentence reduction where the defendant's hypertension made her particularly susceptible to COVID-related complications, giving rise to an extraordinary and compelling reason under the relevant policy statements) (citing United States v. Sawicz, No. 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr 10, 2020) (holding that the defendant's hypertension elevated the risk of illness or death from COVID-19 in the correctional facility and amounted to an extraordinary and compelling reason to grant his release)); United States v. David Jones, No. 15-cr-95 (AJN), ECF No. (May 24, 2020) ("Mr. Jones continues to face extraordinary danger from COVID- 19 so long as he remains in custody, because he suffers from an underlying health condition that makes him especially vulnerable to the virus"). Mr. Jones was a unique grant of a compassionate release motion by the Honorable Judge Nathan in that it was a case involving a death eligible charge that ultimately became non-authorized leading to a plea agreement for a sentence of 108 months. That resulted in the rather youthful Mr. Jones only serving a relative fraction of the original sentence on a very serious violent felony with a violent felony background. He was similarly situated as Mr. Burgos having a comorbidity that elevated the inherent risks and threats of COVID-19 resulting in infection and potentially, death.

Mr. Burgos suffers from one distinct medical condition that places him among those most vulnerable to the risks of aggravated illness and death associated with COVID-19, and these comorbidities would make it impossible for him to avail himself of basic protections against the virus in a federal facility. Accordingly, one of the enumerated examples of an

extraordinary and compelling reason to reduce a previously-imposed sentence is established here, and Mr. Burgos's sentence should be reduced accordingly.

### *i. Federal facilities are particularly dangerous settings for the spread of COVID-19*

Mr. Burgos's term of imprisonment is presently scheduled to commence in the midst of a global pandemic of unparalleled scale—one which is hitting detention facilities in a particularly aggressive way. Jails are exceptionally dangerous settings for the spread of COVID-19. See Exhibit A. Affidavit of Dr. Brie Williams. Inmates and staff cycle in and out of the facilities daily, without screening or testing. Id. Public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe." It is increasingly evident that "infection control is challenging in these settings." Recent reports reveal the dramatically growing rates of contagion within jails and prisons across the country, even as the rate of infection across the nation flattened.

The rapid proliferation of the virus within BOP comes as no surprise. "[C]onditions of confinement—sharing small cells, eating together, using same bathrooms and sinks, delays in medical evaluation and treatment, and rationed access to soap—make prisons more potentially conducive to the transmission of COVID-19 than elsewhere." United States v. Haney, No. 19 Cr. 541, 2020 WL 1821988, at *6 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.). "Jails and prison are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment." United States v. Skelos, No. 15 Cr. 317, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) (Wood, J.).

As of last night, 46, 950 inmates and hundreds of staff members at BOP facilities have tested positive for COVID-19[vi]. 225 inmates have died[vii]. Id. There is significant reason to believe that the number of positive cases is artificially low. There are more than 145,000 federal inmates and 36,000 plus more staff members, but reports indicate that only around 106,000 have been tested —that is, just over half of the population. If the prisons are not testing people, they cannot say whether or not the virus is under control. Indeed, the BOP facilities at Oakdale, Elkton, and Butner all posted low numbers shortly before inmates started dying; there are presently at least 25 deaths among them. Moreover, of the 106, 293 inmates tested, almost half have been positive. This rate informs the immediate need for mass testing. State prison facilities proceeding with such testing protocols report significantly higher positive rates and surveys indicate that federal corrections facilities "documented well over three times the CDC's tally of COVID-10 infections."

Judges in this District have acknowledged that "[t]he COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration." United States v.

Hernandez, No. 18 Cr. 834, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (Engelmeyer, J.). "Confined to a small cell where social distancing is impossible," an inmate like Mr. Burgos "cannot protect [her]self from the spread of a dangerous and highly contagious virus." United States v. Perez, No. 17 Cr. 513, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) (Torres, J.). In short, Mr. Burgos is not safe in the BOP's custody and he should serve his sentence in a safer location: his and his wife's family home.

> ii. *Mr. Burgos's medical condition places him at highest risk of severe illness or death if exposed to COVID-19*

There is no doubt that Mr. Burgos lives with medical conditions that puts him in the company of those at highest risk for serious complications or death when he is exposed to COVID-19 at whatever facility he is designated to. The CDC has published warnings regarding specific risk-factors and underlying medical conditions which place individuals at higher risk for severe illness. In particular, the CDC has identified people who are immunocompromised (such as those with HIV), people with asthma, people with chronic obstructive pulmonary disease (COPD), people with high blood pressure, and people with serious heart conditions as groups of individuals who are at high-risk for severe illness from COVID-19[viii].

Rigorous studies conducted across the world corroborate Mr. Burgos's elevated vulnerability to the risks posed by COVID-19. A study of nearly 56,000 COVID-19 patients in China found that patients with hypertension, diabetes, or chronic respiratory disease (such as asthma) died at approximately six times the rate of patients with no underlying conditions[ix]. A study of 5,700 hospitalized COVID-19 patients in New York City showed that 50% were between 52-75 years old. The same study also showed that patients with *multiple* preexisting conditions were even more likely to require hospitalization. Additionally, fatality statistics collected by the New York State Department of Health demonstrate that over 89% of people who have died from COVID-19 in New York suffered from at least one preexisting medical condition[x]. Thus, Mr. Burgos's demographic background and medical history dramatically increase his chances of dying or developing severe complications requiring hospitalization once he is infected.

Furthermore, given the shorter nature of Mr. Burgos' imposed term of imprisonment, he will be released from incarceration while the dangers posed by COVID-19 to the public at large remain as prevalent as they are today[xi]. He will return to his residential community of Manhattan, New York and to the home he shares with his wife and their children, currently recovering from surgery, potentially exposing him and her community to the deadly virus. As such, Mr. Burgos suffers from a comorbidity that bears significantly on the projected danger incarceration poses to his health, establishing a clear extraordinary and compelling reason to reconsider and reduce his sentence.

**II.  Section 3553(a) Factors Warrant a Sentence Reduction**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in 18 U.S.C. § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A). Those factors, reconsidered in light of the novel and unique challenges COVID-19 presents to inmates in federal facilities, support reducing Mr. Burgos's term of imprisonment.

First, while Mr. Burgos's offense was a serious one, it was nonetheless devoid of any acts of violence towards another and thankfully there are no victims in this case not to condone any violence at all, and he assumed full responsibility for his conduct, in addition to exhibiting profound remorse. In addition to thorough consideration of all factors put forward in § 3553(a), this Court, at sentencing, acknowledged the multiple experiences and the traumas that he has experienced over the course of his life and the role such experiences played in inducing the conduct underlying his offence. Furthermore, the Court considered his numerous and extensive efforts at work as well as continued excellent arrest free conduct under pre-trial services supervision that helped weigh against a more substantial period of incarceration. Ultimately, the sentence was imposed prior to the spread of COVID-19 and, principally, in fulfillment of the goal of deterring any potential for recidivism as well as his past record.

Since Mr. Burgos's sentencing, however, the entire nation has mobilized to confront a fast-spreading and devastating global pandemic. One of the § 3553(a) factors to be considered in the imposition of a sentence is "the need for the sentence imposed to provide the defendant with needed . . . medical care . . . in the most effective manner." Even pre-COVID-19, Courts have determined that this factor weighed against incarceration. Now, this factor disproportionately heightens the punitive dimensions of imposing a term of incarceration.

Mr. Burgos' medical condition make him most vulnerable to the gravest risks associated with this deadly and devastating virus, and adequate medical care has proven to be unattainable at federal facilities during this pandemic. See Exhibit A, Affidavit of Dr. Brie Williams. "Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands."[xii]. Protection from exposure to COVID-19 will be effectively impossible, and no amount of medical care will be able to minimize the risk of severe illness the CDC warns of for people with Mr. Burgos's medical profile[xiii]. Most importantly, consideration of the healthcare challenges Mr. Burgos would face during a pandemic was not factored into his sentence, and now wholly support a non-custodial sentence.

The pandemic has also greatly altered the level of punishment that people experience in federal prisons, such that the justifications underlying terms of imprisonment at the time of sentencing cannot be sustained. At the time of Mr. Burgos's sentencing, in imposing an incarceratory sentence, the Court concluded that the federal prison system would, in some

ways, achieve the statutory goals of sentencing: to punish, deter, and also rehabilitate. Since the inception of the pandemic, the punitive aspects of prison life have skyrocketed, largely offsetting the possibility of the sentence fulfilling deterrence and rehabilitative-oriented goals without imposing far greater a punishment than the Court had intended.  As the Court is aware from the numerous letters of support in Mr. Burgos' sentencing submission, Mr. Burgos is immensely dedicated to his loved ones and family. As such, his experience in the federal criminal justice system and the burden of shame and disappointment that have accompanied it, continue to take a toll on his mental health.

There is one additional 3553 factor that is of crucial importance to any discussion of Mr. Burgos and whether he is rehabilitated.  He was arrested on June 17, 2018 for the incident that is the subject of this motion for a sentence of time served or home confinement.  In three months, it will be over three years since the incident.  He has not been rearrested.  He has not been violated by pre-trial services.  His bond and status on home confinement has not been reviewed, challenged, or revoked.  In sum, since this most unfortunate incident for which Mr. Burgos took full responsibility and properly received complete acceptance of responsibility credit, he has led a law-abiding life.  He has been a model citizen.  He has been a supremely attentive, loving, and competent father to his two children, one of whom has special needs and one who was born very prematurely.  He has been the primary caretaker as his wife suffered tremendously from the premature birth, both physically and mentally.  He has taken his two children to countless medical, psychological, and wellness appointments.  He has continued to apply for gainful employment based on the several licenses he was able to obtain during this (almost) three-year period of home confinement.

We would ask the Court to at least factor in this time period that he heretofore received no credit for via the Court at sentencing nor via any expected BOP calculations.  As it stood before COVID-19, Courts could but usually did not give jail time credit for home detention.  This is something he could receive credit for; to make allowance for the toll and burden of being confined at home for almost three years and never incurring any new arrest nor burdening pre-trial services in any way.  Further, Mr. Burgos never caused the Court concern that Mr. Burgos would re-offend or flee, in granting COVID-19 related extensions of self-surrender dates.

Requiring Mr. Burgos to serve custodial time at a BOP facility, thereby facing a grave risk of compromised health and, even, death, would far exceed the punishment the Court had envisioned at the time of sentencing. In fact, given the global strain of this pandemic and the personal hardship Mr. Burgos has continued to face since pleading guilty, resentencing him to time served is more consistent than ever before with the goals of deterrence the Court had held in central importance.

**Conclusion**

For the reasons detailed above, the Court should immediately grant Mr. Burgos compassionate release and sentence him to time served, or home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A). Doing so is consistent with the applicable statutes, Mr. Burgos' safety, and the general public's safety. Alternatively, Mr. Burgos requests this Court further extend his self-surrender deadline until the COVID-19 pandemic is under control nationally and in the BOP in particular.

Respectfully submitted,

/s/ Jonathan Sussman, Esq.

Counsel for Ariel Burgos

[i] <u>New York Coronavirus Map and Case Count,</u> NY Times (March 5, 2021)

[ii] CDC, <u>Cases in the U.S.</u>, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited March 5, 2021)

[iii] <u>WHO Coronavirus Disease (COVID-19) Dashboard,</u> WORLD HEALTH ORGANIZATION), https://covid19.who.int/ (last visited March 5, 2021).

[iv] <u>Coronavirus disease (COVID-19) Situation Report</u>, WORLD HEALTH ORGANIZATION, (March 5, 2021), https://www.who.int/docs/default- (last visited March 5, 2021).

[v] John Hopkins University of Medicine Coronavirus Resource Center at coronavirus.jhu.edu (last visited on March 5, 2021)

[vi] <u>COVID-19 Cases</u>, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited March 5, 2021).

[vii] Id.

[viii] CDC, supra n. 2; CDC, <u>People of Any Age with Underlying Medical Conditions</u>, https://www.cdc.gov/coronavirus/2019- ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 30, 2020).

[ix] <u>Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)</u>, WORLD HEALTH ORGANIZATION, (Feb. 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-

covid-19-final-report.pdf ("Individuals at highest risk for severe disease and death include people aged over 60 years and those with underlying conditions such as hypertension, diabetes, cardiovascular disease, chronic respiratory disease and cancer").

[x] NY State Dep't of Health, Fatality Data, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID- 19Tracker-Fatalities (last visited June 14, 2020).

[xi] Even if the Court is to assess the timeline ahead of the global community battling COVID-19 optimistically, development of a vaccine that is both readily available and accessible, as well as effective, is likely years away. See COVID-19 (Coronavirus Vaccine): Get the Facts, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus- vaccine/art-20484859 (last visited June 17, 2020) ("[r]ealistically, a vaccine will take 12 to 18 months or longer to develop and test in human clinical trials. And we don't know yet whether an effective vaccine is possible for this virus"); See also When a Coronavirus Vaccine is Developed, Who Will be First in Line to Get It?, U.S.A. TODAY, https://www.usatoday.com/story/news/health/2020/05/18/coronavirus-vaccine-who- get-first-cdc-panel-usually-decides/5202932002/ (last visited June 17, 2020) ("No matter how well-prepared we are, there won't immediately be enough coronavirus vaccine to immunize all Americans. Choices will have to be made about who goes to the front of the line").

[xii] Special Report: 'Death Sentence' – the Hidden Coronavirus Toll in U.S. Jails and Prisons, REUTERS (May 18, 2020), https://www.reuters.com/article/us-health-

[xiii] Id.